The next case for argument is Optis Cellular Technology v. Apple, 22-1904. Good morning and may it please the Court, Mark Fleming from WilmerHale on behalf of  I would focus on three legal errors, any one of which requires a remand of the whole case. The liability verdict, the ineligibility of the 332 patent, and the indefiniteness of the 557 patent. If time allows, I'd also like to address the inadmissibility of the Qualcomm agreements. What about starting with the UK decision of last week? Because we were kind of waiting for a 28-day from either or both of you. I mean, you had put this issue before us in terms of the status of that early on in these proceedings, and the opinion's public. We were waiting to hear from you in terms of what the relevance or impact or consequence or whatever. The Court has denied our request to stay proceedings, in this case, pending the UK proceedings, so in terms of the issues that we're here to argue today, it does not have any impact. The UK Court of Appeal increased, among other things, increased the royalty. I'm sorry, you're saying the UK action has no impact? The decision that came out last week has no impact on the issues I'm here to argue today. It increased the royalty rate for a global portfolio above what the trial judge had assessed, below the amount that Optus had requested. Both parties, I understand, have the opportunity to seek further appeal from the UK Supreme Court, but it doesn't affect any of the issues I'm here to argue today. Well, so what happens now? There's just an appeal process, as there is here, to a higher court. Wasn't there a requirement under the opinion, which we've all read, that required an additional briefing within seven days and suggested that the court was going to do a further analysis, that this wasn't the final word? That is taking place as we speak. There have been further submissions that I believe are going to be made to the UK courts regarding the terms of a court-ordered license, and that process is going to continue in the Court of Appeal, and then following that, there will be a time for either party to seek leave for further review to the UK Supreme Court. Let's go back. I'm a little baffled here. You say that the UK opinion has no, judgment has no bearing in this proceeding. Well, the UK proceeding as a whole might ultimately have a bearing, and that's what we said in our report. All right. Let's say we were to reverse the trial court below. Would that have an effect? Would the UK judgment at that point in time have bearing? It may well, at such time when there is an ultimate license, so the proceeding ultimately in the UK is to determine the terms of a Franz license to Optus's global portfolio. If the judgment makes clear that the UK court is looking at this case and looking at what the Federal Circuit is going to do, I'm baffled by your statement that it doesn't really matter. No, I'm not here to say that the proceeding doesn't matter. I'm saying it doesn't affect the issues under U.S. law with respect to the five U.S. patents in this case, which this court is reviewing based on the briefing that it has received. It may well be, and this is what we indicated in our briefing, it may well be that at such time as there is a final court-determined license in the UK that covers the five U.S. patents at issue in this case, that we would approach whether it's this court or whether it's the district court if this court remands for further release based on that. That's why we suggested that the court say proceedings in order to see what the endgame in the UK would be. The court has denied that motion. I'm not here to re-argue that. The other thing that obviously jumped off the pages of this opinion for our purposes is the fairly extensive discussion with regard to grounds 23 and 24 about what went down in E.D. Texas and what's likely to happen here at the Court of Appeals. Are you all comfortable with that analysis, which seems to have at least given some effect to principles of comedy and some effect to even establishing in paragraph 257 a floor? Based on the verdicts that are now at issue before us? I must address I'm not a UK-qualified lawyer, nor am I read into what, and I'm not even sure that Apple has determined what further steps it's going to take in the UK seeing that opinion, which is fairly fresh. Those are definitely steps that are going to have to be considered on the advice of UK counsel. Fair enough. I'd answer the question more fulsomely if I had an answer. I'm afraid I just don't have an answer. I do think that this has bearing, whether it has actual determination that's contrary to this or not, but this does have bearing on this proceeding, and I think it would have been well for counsel to at least notify the court with a letter and with some sort of statement as to if you think it doesn't matter, then that would have been good for you to notify the court on. I take the point, Judge Rayner, and I'm sorry that we didn't do that in retrospect. The reason we didn't is because the court had denied our motion to postpone the proceedings. And ultimately, the issues that we're going to argue today that we've briefed are not issues that are affected by this decision by the Court of Appeal in the UK. If ultimately there is a... I'm sure you're anxious to get into three issues that I'm talking about, but you raised a ton of issues in the briefing. Three of them are about damages evidence. I'm just wondering if the UK situation that we started with might suggest that if you prevail on any of the issues you're raising, and we were to say, hypothetically, there had to be a new trial on liability and or damages, should we be careful about jumping in and addressing your damages evidence admissibility abuse of discretion issues, given that, in my hypothetical, there'd be a new trial anyway. Who knows what damages evidence either side's going to want to present. And that issue is very much front and center and being litigated in the UK. Might that be a reason that we should just stay away from those issues, which are near the end of your briefing? So, they're near the end because liability and damages typically are sequenced in that way, but I do want to make sure, if I can, that I can at least stress the admissibility of the Qualcomm agreement, because I think that is important for guidance. Sure, but my last question is just one of the questions we've used less. Is it unnecessary to reach them? And even if unnecessary, might we be well-advised not to reach them, again, on the theory, hypothetically, that you were getting a new trial anyway? If we are getting a new trial, and I'm happy to proceed and answer the question on that assumption, it isn't strictly necessary. I think it would be very helpful for this court to provide guidance, particularly if it concludes, as I hope it will, that the Qualcomm agreements are manifestly not comparable and should not have been admitted. That, of course, is a matter of U.S. law and a matter of this court's jurisprudence. It's not affected by anything that the U.K. court has done, and in fact, I think as all members of the panel have acknowledged, the U.K. court is very mindful of what's going on here, just as this court is mindful of what's going on in the U.K., but neither court, at least so far, has suggested that the issue of admissibility of evidence should be covered by anything other than an internal domestic law, which is all we're asking for. Okay, well, I know you're dying to get to your three, and I've already forgotten what the three points were, but I promise we will let you, but just to kind of follow up on Judge Stark's thing about where we're left at the end, because I don't know if I'll have time to get to it, you raised, among your million issues, infringement stuff, and if in fact, hypothetically, our conclusion would be that there needs to be a new trial, then that infringement stuff, those infringement allegations go away, right? They can. We can try them again. Obviously, I would welcome any opportunity to discuss anything that the court is interested in, because if there are fewer patents going back for a new trial, that saves further issues in any subsequent appeal. No, but some of the details on the absentee of the infringement finding. If it's going back for a new trial on liability and damages, perhaps with the ineligible patent taken out, for instance, then yes, I agree the court can leave that for another day. Let's start with your three points. I know first was liability, and I lost track of that. The first is the verdict form. After that is ineligibility of the 332, and then the indefiniteness of the means plus function claim. I'm sorry, I've got to stop you. What about the 332, but you've got another validity contention too? So the 332 is the ineligibility argument, and then you've got an indefiniteness. The means plus function of claim one of the 557. Yes, I'd love to cover all of them, if the court will allow. So, starting with the verdict form. Over our objection, it collapsed multiple infringement causes of action into a single verdict question covering five patents, and that produced two errors. First of all, it meant that the jury was able to decide that Apple infringed any one patent without unanimously agreeing on which one, and the result is we didn't get a unanimous verdict on each cause of action. No one has cited any authority suggesting that that's permissible. Well, I think Mr. Jay states a number of cases, including surgical something or other. Structural, yes. What's your response to that? Structural rubber. Infringement was broken out patent by patent. It was done by a table. In fact, this court's opinion on page 712 reproduces the table in the opinion. Now, it's certainly true that patent cases can be decided by general verdict that encompasses all the issues of validity and infringement, but structural rubber never suggested you could take multiple patents and combine them together in one question. And that case did the opposite, right? It did absolutely the opposite. The verdict form went patent by patent. There was a table for the jury to fill out, and it's printed in the court's opinion. And another argument Mr. Jay makes is that you were talking about patents here, and the real terminology here are claims. So, there were several claims in each of the patents that you kind of didn't, I don't know, I don't recall now. It's a question of preservation of the argument where you were sort of suggesting there needed to be a separate question on each of the claims or each of the patents. We asked for a patent by patent verdict, and in fact, Mr. Jay's client Optus also asked for a patent by patent verdict, so it wasn't disputed. It's true. In many cases, the verdict goes patent claim by patent claim. And there were several claims. There are at least two claims on two or three of these patents. There are a couple of patents in this case where more than one claim is asserted. We wanted to minimize the number of disputes in front of the district court. Optus, the plaintiff, was comfortable with a patent by patent verdict before the first trial, so we did the same thing. The only dispute among us at that point was whether to break out literal infringement and infringement by equivalence. But then, when the district court said, I'm going to use a single infringement question combining all the patents together, then we objected to that, obviously. So, the court adopted Sue Espont's verdict form, correct? Yes, Your Honor. And there had been arguments before that on the separation within the verdict form. Not only were there arguments, we had agreed on it. If you look at the... After the court, Sue Espont took the action that it did. Was there any further objection from the court? There was, absolutely. And this is on page 96 of the appendix. It's also in the addendum to our blue brief. I'll point you directly to it. On page 96, starting at line 6, my partner, Mr. Selwyn, says, Yes, for the record, Your Honor, Apple objects to question 1 because it does not break out infringement by patent or by literal infringement and infringement under the doctrine of equivalence. The court, that's overruled. So, that was fully preserved. And then we presented it again in our motion for a new trial, and the judge acknowledged that we made the argument and rejected it on the merits. So, it's fully preserved for this court's review. The court said at 184 that you wanted a breakdown product by product as well. I couldn't find that in the record. Did you propose a breakdown product by product? No, I don't. We did not do that, and we're not pressing that in front of this court. The logic of your position does seem to be that you had a right to insist on a claim by claim, product by product, patent by patent, a very complex set of questioning. That you had the right to do it, but that I guess your position is you voluntarily gave up, I guess forfeited your right to the extent that there would need to be a breakdown by product or by claim. Is that your position? It's not quite that, Judge Stark, because I think there will be situations where, take for instance, for simplicity's sake, say it's one patent with multiple patent claims that are asserted, but there's only one limitation in each claim that's in dispute, such that if the jury were to divide on the different claims, it ultimately wouldn't make a difference because they all would have found that the sole disputed limitation was practiced by the accused products. Same thing, if the multiple products were accused, but there was really no difference in the infringement read against all of them, then I don't think it would be, because the verdict would be unanimous as to all causes of action. That's not true when you have multiple products. I think I understand. Page 25 of the yellow brief, you suggest that there's not an independent cause of action for each asserted claim of the same patent, and you're setting I4I. I'm just wondering, have we ever said that? It had been my understanding that each, because of course each patent claim is its own invention, its own property, right? I'm talking about the topic point in my head. When you say the Walter I4I rule applies to alternative factual theories for a single cause of action, for instance, multiple claims of a given patent. I read that to mean you're conceding or taking the view that multiple claims of a given patent are all part of a single cause of action, and I'm not sure if that's quite right. I'm not even sure if that's your position. Am I misreading it? Now that you point that out, it may be that that is not always the case, and maybe the answer that I gave is the better framed answer to it, which is very often the different claims in a single patent will rise and fall together. And the reason I'm asking, of course, is I think we're going to hear from Mr. Jay that the logic of your position is that you should have asked for a claim-by-claim breakdown, but you didn't, and somehow that leads to waiver of today's argument, or should cause us to be skeptical of your position because you're not taking it as far as you should. Well, to take that question head on, I don't think we are required. Even if we had had a right to ask for a claim-by-claim form in this case, we were not required to do so in order to preserve our request for a patent-by-patent claim form, particularly given that Optus itself had requested a patent-by-patent claim form, and we made the decision that because of this case, there only... But it appears to me in your briefing here, you are asking for a claim-by-claim. No, Your Honor. Our position is we were entitled to a patent-by-patent. That's what we asked for, that's what we preserved, and that's what we think should have happened here. Okay. You both, Counsel, are very experienced, and I don't know if this is a fair question, but is this kind of verdict form unusual? I mean, you know, our learned colleague in E.D. Texas has had hundreds of trials. Have you seen this? Is this a common occurrence in this jurisdiction or in other jurisdictions to have this kind of jury form? So, in my experience, Judge Cross, the answer is it used to be, and let me explain what I mean. Mr. Jay and I were both here in November in a case called United Services Automobile Association versus PNC Bank that did involve a verdict form like this one. We preserved and made the very same argument. I wasn't on the panel. None of you was? Okay. No, I'm just pointing it out, because that's another example where the same argument was made. We don't have that opinion. There are lots of other ways to resolve that case, so it may not be addressed in that case. However, in preparing for today, we looked at all patent cases that went to verdict since January 2024, and we did not find any, including from this district court, that used a verdict form like this. To the extent it was used before, it does not seem like it's being used anymore. Did the court ever explain why it chose that verdict form, given the objections that were made? It did not, Your Honor. I read you the response, which was, that's overruled. And then in response to our motion for new trial, although the judge acknowledged that we made the argument, there was no reasoning in particular as to why this form was chosen. And it doesn't seem to be used anymore. Move on to point two. One of the striking facts here, though, is the damages award at the first trial appears to be to the penny what Mr. Kennedy, their expert, said should be awarded if, but only if, there was infringement of all claims that were asserted in all five patents. Am I right about that? And if so, isn't that pretty strong evidence that the jury did unanimously find infringement of all the claims that were asserted? You're right about the math, Judge Stark. I don't think that is the inference to draw from this for two reasons. First of all, the district court certainly did not find that the jury had unanimously found infringement of all five patents. We know that because the judgment that was entered after the first trial and after the second trial does not adjudicate Apple as having infringed all five patents. It's simply one or more claims, and we don't know which ones. After the first trial, Appendix 134, if I can just make sure I read it verbatim. Appendix 134 is the judgment after the first trial, the first item, Apple has infringed one or more of the asserted claims, no further explanation as to which ones. And then after the second trial, Appendix 221, Item 1A, Apple has infringed one or more of the asserted claims. And then the second problem with the inference that Mr. Jay is going to ask you to draw is that awarding Optus' total ask in the case was a very easy way to satisfy each juror in the event that they went around the table and the jurors divided on which patent was infringed. Juror number one says, I think the 284 is infringed and Optus deserves to be paid for it. Juror number two says, I think the 332 is infringed and Optus deserves to be paid for it, and so on. The easiest thing to do is say, okay, well, we can all agree that Apple infringed one or more of the claims or any of the claims, and then I'm going to just give them the full ask. Easy enough to do. Juries compromise all the time, and there is no reason— It doesn't require us, I'm sorry. It doesn't require us to presume the jury didn't follow the instructions that Judge Gilstrap gave them. There were no instructions, and this is very important, that told the jury that it had to be unanimous claim by claim, and this is very important. The instructions said infringement is assessed claim by claim, but it doesn't say that you have to agree unanimously that any particular claim is infringed. The unanimity instruction, and this is on page 98 of the appendix, the verdict form says only your answer to each question on the verdict form must be unanimous, and so it was possible for them to divide, as is often the case, on the subsidiary factual issues that go into determining liability, and then answer the question unanimously. That's what we were objecting to, and it would have been fixed by having a patent by patent verdict form. Isn't it—because I had the same question initially that Judge Stark had, and then it seemed to me that the jury accepted the jury form for whatever it said, so maybe this is kind of what your answer was, that they're sitting there and they say, and they told us that there's going to be infringement of these claims if any of them are. We are concluding that they all are because any of them we've all said at least one of them is, and so that's the appropriate valuation given the jury form. I think it took away a kind of disciplined approach to the claim by claim and allowed them just to write down the overall number because they all agree that OFTA should get something, and they could well have divided on what for. You want to move on to two? Thank you very much. The 332 patent, we all agree that claims directed to a mathematical formula are not eligible. This court has said that many times. At step one, we look to the focus of the claimed advance, and the spec here tells us the object of the present invention is using a specific mathematical operation. Can I cut you short just because, as I said, we are familiar with late arguments. What is the consequence of what you're asking for? Judge Gilstrap never reached step two because he threw it out on one. Yes, that's right. The ineligibility of the arguments, yes. So in your view, does step two go to the jury? I think this is an easy step two case where this court can reach it, as it has in other cases like Free Stream Media versus Alfonso or Chamberlain versus Tektronik because once you take the equation out, the double modulo equation, there is nothing new or inventive in this claim. There's no structure, there's no new circuit, there's no improved device. Was there briefing on this? Did someone maintain that there was, I mean, a step one and a step two problem? There's an argument to be made for step two? Absolutely. We briefed it and Office has responded, absolutely. And I don't ultimately think it can be disputed that once you take the equation out of the equation, as it were, all that remains is very well known. Not only were the devices, the user equipment and the base station and all that were well known, but using random numbers in order to determine where the phone is going to start searching the channel space was also well known. All that this claim does is say, instead of using the single modulo equations, which were known in the prior art, use this double modulo equation. One question. You tried to prove that this claim was also obvious, I believe, with presumably much of the same evidence that would come up at step two, correct? We did try to prove obviousness. We did not prevail on that. That suggests, at least at a common sense level, there's a fact dispute here. No more so than in the Solutran case, where there was a PTAB decision finding the claims non-obvious that had been affirmed by this court. In the In re Stanford case, this court made very clear that claims could be ineligible, even if the abstraction was not obvious. If you look at the re-exam decision that Optus puts in front of this court and asks the court to take judicial notice of, it's not in the record because it came up after the case. The reason the examiner let these claims get out of re-exam is because the equation was supposedly not obvious. The prior art, we cite a reference on 7436, and the examiner likewise cites the prior art as showing that the prior art knew how to use single modulo equations to randomize the starting point of the search. The only difference here was then the only one that the re-exam decision cites on pages six to seven is using this different equation that supposedly randomizes the numbers a little bit better. And that is the only arguably inventive concept here, and it is abstract because it's a mathematical formula. I want you to just spend a little time on the indefinite, because we had a little exchange in 28J letters about the Fintive case, and about the claim on claim tensor. Can you address that briefly? Thank you very much. I think after Williamson, and definitely after last week's Fintive decision, selecting unit is plainly a means plus function term. Unit is a nonce word, as the court indicated in the Diebold case, and nothing in the art suggests that selecting unit connotes any particular structure. Our expert, Mr. Lanning, said this without contradiction. A selecting unit is just something that selects. It could select anything. It could select different things for different purposes, using different criteria. Optus has not pointed to anything in the art suggesting that selecting unit means something in particular in terms of structure. And nothing else in the claim certainly points to structure. The claim just says selecting unit selects a sequence that's then transmitted. And as the court said in Meteorites, and again last week in Fintive, merely saying that one feature is connected to and interacts with other features doesn't tell you what structure is used. When you get to step two, and you look at, I mean, the function here is randomly selecting a sequence from a plurality of sequences. The spec gives you nothing to tell you how to implement that. It's notable that when Optus responded on Wednesday evening to our 20HA letter, they cited the highly general language at the end of the patent at column nine. And clearly that's the best that they have, and I think it's worth looking at that. This is on page 338 of the appendix, starting at line 26. Now, first of all, what I'd say is it's not linked to the selecting unit term at all. It applies to any function block in the patent. It says it can be implemented by hardware or software. It says it can be an integrated circuit, dedicated circuitry, or general purpose processors. And it then says if integrated circuit technology comes out to replace LSI, that can be used too, and application of biotechnology is also possible. If that is sufficient disclosure, then there's nothing left of section 112, paragraph 6, because this essentially says anything that does the function can be covered by this claim. Okay. Moving on to the next number. Are we at number three yet? We could be. Well, we're at number 3.5 in the sense that I suppose, I think Mr. J is going to say that if you agree with me on means plus function, that doesn't matter because there's still claim 10 out there, the method claim. First of all, I'd say that's not correct under this court's I4I decision, because indefinitely it's a legal defect in a theory that's been presented, and when you show a legal error, we can't assume that the jury didn't rely on that claim in reaching its outcome, so that I think on its own requires a remand. I think you can also find, however, that there wasn't any proof of infringement of method claim 10, because if it's a method, there has to be proof that somebody These are infringement arguments here. The indefiniteness argument doesn't go to claim 10. It does not. It's claim 1 only, exactly, which is why we have this separate, and why Mr. J is going to invoke claim 10 as a way to get around the indefiniteness of claim 1. I submit that he can't on its own. At the very least, we get a retrial as to claim 10. I think the court could dispatch this patent entirely, because the case for no substantial evidence of infringement on claim 10 is really very plain, because claim 10 requires selecting a sequence from a plurality of groups, and if you look at the standard, and their only argument for this is that claim 10 is supposedly standard essential, but if you look at the standard on 26378 and 26379, it is clear as day that there does not have to be a plurality of groups. Okay, there's some things we have to limit. Good. Especially infringement is one of them. Anything else? May I spend one minute on the Qualcomm licenses, which is a damages issue? Agreements that are not sufficiently comparable are not admissible. This court has said that repeatedly. Optus's own expert admitted the Qualcomm agreements were not sufficiently comparable for use as a direct indication of the royalty, and these agreements are radically different in at least three ways. First of all, they come up in a particular economic situation where Apple needed Qualcomm's chips, and Qualcomm conditioned the sale of chips on licensing Qualcomm's patent portfolio on terms favorable to Qualcomm. Second of all, the Qualcomm agreements covered an extremely large number of patents. I can't say it in open court. It's redacted, but the court knows it's on page 60 of our blue brief. And third, the agreements were changed by the coercive environment of litigation, and not just any litigation. The list of cases and litigations that were settled by this agreement is 20 pages long. What are your best cases that we have, Erickson, or what are our cases that deal with this? This has the flavor of the entire market value rule thing, too. Oh, I don't mean to invoke the entire market value rule. Omega patents, YLAN, Laser Dynamics, Lucent, all cases where this court has said that agreements that are remarkably different and radically different from the hypothetical negotiation are not admissible, and the prospect of cross-examination is not enough. Now, I think Mr. Jay had a lot to say about this, but at page 62 of the red brief, he says that Mr. Kennedy relied on this agreement for a limited use. And I was going to ask him whether that, in his mind, meant comparability, but what's your reaction to that? So my submission is it doesn't matter that it was used only as a check, as he called it, because the agreement itself was inadmissible for any purpose. I mean, that's what this court held in Unilock, right, where the entire market value was used only as a check on the number that was being offered. It still spewed the damages horizon for the jury, and that's the ultimate harm here and why the court ordered the licenses excluded in the cases I named. I'd point out that we made a demonstration in our blue brief of the undue prejudice from these big numbers that came in. Is one of the grounds you moved to exclude the license Rule 403? Yes, absolutely. We challenged it on every possible basis. Did the district court address the Rule 403 grounds that this is just too unfairly prejudicial compared to whatever probative value it has? Yes, we had a motion in limine on this. It was denied on page 64 of the appendix, and it's phrased in a general way, but it's starting at line four. With regard to what has been classified as, quote, other issues, particularly the bargaining share analysis, the method claims, the Qualcomm agreement, and the Dwyer opinion, I'm going to deny those as well. I think those can be addressed by cross-examination. Okay, one more question which you weren't raised, but I just quickly. The issue about admitting the confidential negotiation settlement. If we're in Fran land, and bad faith is a question, and what they did and what you do, why wouldn't confidential negotiations at the party's confidential negotiation settlement be applicable and relevant and admissible? Well, Rule 408 continues to apply regardless of whether there's Fran in the case. I'll note that the issues that you're on are brought up. were not relevant to whether the jury's reasonable royalty award was Fran or not. Those were issues raised, if at all, by count eight of Optus's complaint, which Optus decided to try to the bench, and the judge ultimately decided he lacked jurisdiction over. But none of that came in in the new trial. It didn't need to. The confidentiality agreement that the parties have rendered that inadmissible, and it's also irrelevant because the first offer that was being assessed by Optus was at least five years after the hypothetical negotiation. So it wasn't ultimately relevant to the exercise that the jury was engaged in. I'd also point out the patentee's offer at that point, when the negotiations had already started under this court's decision in Whitserv, is not valid evidence of a reasonable royalty because, as this court recognized, patentees can artificially inflate the royalty rate by making outrageous offers, which is exactly what Optus did. I thank the court very much for its patience and attention. And we're going to keep stuff even, so we will give you some rebuttal time. Thank you, Your Honor. Not much, I hope. No worries. We're going to keep stuff even. Thank you, Your Honors. May it please the court, I'm William Jay for the Optus at the least. Why don't I start with the verdict form? Why don't you start with the U.S. Judiciary proceedings, if you have anything to add to what Mr. Fleming said. A couple of things. One, I think it would make sense for us to update the court once the Court of Appeal issues its order and court-determined license. As you know, there will be submissions due to the Court of Appeal next week, and at some point after that, it will issue its order and court-determined license. They're very efficient, and you told us in one of the earlier filings they're going to decide within six to eight weeks, and they hit their mark. Is there an anticipated time frame in which they're going to act with respect to this Part 2? We think it could be as soon as a day after the submissions, which would be May 16th. We think it's more likely that it will take a short amount of additional time. This is obviously guesswork on the part of my colleagues in the U.K., but we don't think it will be very long. And then the time for the parties to seek, for Apple to seek permission from the Court of Appeal to take further review will run from the issuance of that order. And what is that time frame? That will be 21 days, and then there's a further opportunity, if it's denied, to seek leave from the Supreme Court of the U.K. itself. That's 28 days. We have no request for a stay in front of us of this matter, correct? Correct. Our position has always been that the U.K. proceedings are not relevant to your decision. In this case, I think the provision of the Court of Appeal decision, making the U.S. the floor, confirms that that is right. You would kind of ask the opposite question, whether the proceedings in this court are relevant to what's happening in the U.K. And yes, that's why there's the provision in the judgment that will be reflected in the court-determined license about a floor. It's clear to me that the U.K. court is looking at what's happening here before the federal circuit. And so to the extent that there's a substantive change in the landscape that we've come to understand is in place right now, I think it would be good to hear from these parties as to if we still have a situation where nothing has to be done or the two proceedings are separate enough to where it doesn't warrant any additional action on our part as well. Right. I think my guess is that once the order and court-determined license come out, we'll be able to kind of point you to particular aspects of that as well as the judgment to answer that question. But what I've said is based on the judgment and the judgment alone, but the judgment is obviously the Court of Appeal was well aware of everything going on in this court right down to the fact that we would be here today. So I think that they understand that this appeal would proceed. They understand it's recited in the judgment that there could be multiple outcomes. The outcomes could result in the award going up, going down, or staying the same. So the Court of Appeal is well aware of that. They don't need to contemplate the fourth option where the result after our decision, of course I have no idea what our decision will be, but that it could be a $0 award plus a right to a new trial. They seem to contemplate $0, $300 million, or $500 million. Does that mean anything that they may not have contemplated that fourth or fifth or sixth option? I think I wouldn't read too much into the court setting out the endpoints of the spectrum. But in other words, I don't think the court is unaware of the possible outcomes in this case. And ultimately, I don't think that bears on anything that you have to do in this case. Obviously, the trial court had basically issued an order that sought to restrict what the parties could do in this case, and that's now been set aside. So I really don't think there's anything that the U.K. court is asking this court to do or not do. It's just watching to see what you do. Okay. Very good. So to the verdict form, if we may. And I think I do want to begin, actually, with the point that was really only barely touched on by Mr. Fleming, which is we've emphasized in our brief, which is that this really is more a question about the jury instructions than about the verdict form. In other words, the verdict form asked this single infringement question, and our friends on the other side say there's a risk that that would cause jurors to not answer the questions on a unanimous and claim-by-claim basis. And the jury instructions twice told the jury that infringement is to be determined claim-by-claim, once at the beginning of the trial, once at the end of the trial. Also, can you show us where the jury was instructed, you, the jury, must find infringement claim-by-claim and give them any instruction that would suggest to them that if they all unanimously agree that at least one patent claim was infringed, that the answer to question one should be no, that unless they were unanimous on at least a single claim, that the answer is no, because I don't see that in the jury instructions. So there are two pieces, Judge Stark, to your question. So one is that the instructions do say infringement is to be judged claim-by-claim. They say it sort of in a third person, right? They don't, the judge doesn't direct the jurors, you must proceed claim-by-claim to find infringement. Well, all right, so I'll just read you what is that. How does that answer, then tell me how that necessarily answers the question, if you're a juror, to get that instruction, but then to say that they prove infringement of any of the asserted claims and the answer would be yes. You know, I understand the point, and this is, of course, the fact that we're having this conversation about whether the instructions were adequate to go with the verdict form just highlights that Apple didn't ask for clarifications of these instructions. It only asked, it only made the sort of per se objection that they were, and you heard Mr. Fleming say again this morning, that they are entitled by law to a verdict form that divides things up patent by patent. And they have obviously also made and have now, I think, dropped their argument that they were entitled to have infringement and infringement by equivalence separated. So that's the only objection they preserved. They didn't preserve an objection. They didn't request a better instruction. They didn't request sort of tinkering with the language of the verdict form. I do want to take you to one aspect of that. They did request patent by patent, and you did as well. Sure, that's right. And preserved. Yes, but the reason, the argument that they made after trial for the first time is that there was this risk of non-unanimous decision making, and they preserved at trial this objection that they're entitled to patent by patent. But, and I think your colloquy with Mr. Fleming brought out, that if the concern is about non-unanimous decision making, then there's no principle distinction between a rule that says you're entitled to a patent by patent or a theory by theory or a claim by claim or a product by product breakdown. Because each of those is a thing that jurors might in theory disagree on. There is no per se rule, and Mr. Fleming did not cite you any case, any case at all, that suggests that there is a bright line for patent by patent breakdowns. And if you think about some of the examples that he gave about how special verdicts work, I mean, I think that that actually makes our point for us. I mean, so he suggested that it's okay to have the same claims, sorry, to have two different claims from the same patent in the same question if the sort of the issue in contention at trial is the same. Why would that be different? I think you may be right on the logic, but I don't see how that helps you here. He could have argued, on your reasoning, he could have argued for a more elaborate form than he did. So he's a nice guy. He made it easier for the jury. But he never agreed to just one catch-all question for all five patents. I'm not saying that he agreed to the catch-all question. I'm saying that he's restricted himself to this argument that there's something special about patent by patent, a theory that is not grounded in anything in the law. And the further point that I want to make, which ties together the point about the damages award and the language of the verdict form, is that I think it is really quite clear in this case that the jury found infringement of all five patents from the adding up of the numbers. Now, Mr. Fleming gave you his best argument for how the jury could possibly have arrived at this conclusion by some other means. And I think what I would point you to is on the verdict form, appendix 104. So this is the top of the page where the damages award is. And it says, if you answer question number 4A and 4B, and 4A is the money damages, only as to any assertive claim that you have found both to be infringed and not invalid. So the suggestion that the jurors are including the broken down number from patents that they didn't find to be infringed as some kind of compromise, I don't think that that would require you, as you said to start. I just don't see how that can be right. If you had, just to make it simple, five jurors and five patents, each juror only thinks one patent was infringed. That's my hypothetical. How does the jury tell us that on this verdict sheet? So certainly there is no grid with checkboxes for each patent. And I think that, and I'll just candidly say that if it had come back with $300 million as a round number as it did at the retrial, we wouldn't be able to make this argument that I'm making right now. True. I'm glad you can see that. But just to my question first, in my hypothetical, each juror only found one different patent infringed. They were not unanimous on any one of the five. First of all, you agree that they should, in that instance, they should answer no to the question. Right. So if no juror agrees, I think they would be ordered to keep deliberating. Right. Well, they have no way to communicate that to us. The correct answer is you've not proven, you've not met your burden, if that's the end result. You've lost four to one on each patent in my hypothetical. If the jury is not unanimous. Right. And so I just don't see what in our record, the verdict sheet instructions or even the dollar figure awarded allows us to be even reasonably certain that that's not what happened here. So I think that in your hypothetical, so like let's say there was one juror who wants to award money on, let's say, the 557 patent. They're the one juror who finds that one infringed. So then they would vote to award $2.1 million. That's what the damages figure for that patent is. For the 833 patent, that juror probably would want to award $203 million. There's no way that the five jurors together would get up to $506.2 million, the exact sum of all of the independent damages figures for the five patents. And I think the harmless error principle from cases like Texas, optoelectronic, and for that matter, I4I, is that what you need is reasonable certainty. Is the same true because this is gone for other reasons because of FRAND. This verdict is gone. Correct. Can the same be said of the damages requests on the $300 million? No. So that doesn't – so what you're using here didn't happen. You don't have that added bonus to say, well, yes, we think they understood it correctly because of the damages number in the second trial. So the jury was instructed at the second trial by the district court that it should treat all five patents as infringed and that it was only going to decide the damages number. And I think Mr. Fleming suggests that the district court did not read the verdict because it did not embody in the judgment a finding of infringement of all five patents. I think you can see from the instruction that the district court gave at the retrial that the district court did think that all five patents had been found infringed. He read the verdict. Well, then why did he write in the judgment that Apples infringed one or more of the asserted claims? He just repeated the verdict form. The judgment just repeats what the verdict form says, and that is what the jury found. But I think the question is both, one, is there a prejudicial legal error in the – I'm sorry. The verdict form, of course, doesn't say one or more claims. Oh, I'm sorry. It says, did Optic prove by preponderance of the evidence that Apple infringed any of the asserted claims? Judge Gilstrap understood that, arguably, and the judgment added, okay, Optic, you proved that Apple has infringed one or more of the asserted claims, but parenthetically, we don't know which one. No, I'm sorry for misspeaking. But I think that my answer is still the instruction that the judge gave at the retrial, that the judge instructed the jury to decide damages for the infringement of the five patents because the court concluded that that's what had been found at the first trial. And I think that the question both as to, is there a legal error in this verdict form that caused prejudice, and then, as we get to some of the other issues, is there prejudice to the verdict if one of these patents, but not others, has some problem with the verdict? I think that you can conclude with the requisite reasonable certainty that the jury found infringement as to all five. And that wouldn't help us sustain the $300 million damage award, but recall that what Mr. Fleming is trying to do is to take even an infringement issue on one of these other patents and say any problem causes you to blow up the entire verdict and retry everything. I mean, I take him to concede that he wouldn't retry invalidity because they don't have any arguments about that, but that he wants to retry infringement as well as damages, and not just excise the patent, but re-litigate. What I think the clear reading of the verdict form is that this jury found infringement of all five, and that you're not supposed to re-examine findings by the jury under that circumstance, nor are you supposed to reverse based on errors that aren't prejudicial. Okay, why don't we move on? Your sequence follow, Mr. Fleming? I'd be happy to. So on 101, I think that the key point here is this is not a patent that is directed to the equation. So Mr. Fleming kind of got to this late in his presentation, but the question is this is an invention that is for use in this particular field and is looking for a maximally efficient way of identifying the search space that each handset can use so that, one, the search spaces collide with each other minimally so that you can send more messages to more handsets, and the handsets operate more efficiently by using less power to decode fewer regions of the signal, and figuring out what the most effective means of randomizing. That was a significant issue that many of the scientists working on the LTE standard had a debate about, and there's evidence about this in the record. Our expert testified about this in the context of obviousness and damages. And so if we were to get to step two, we've got plenty of evidence about the inventiveness of it. Could you just summarize that? Or in a few pieces, what's your best evidence that there's a fact dispute at step two if we were to reach that? Now, obviously, we didn't try it as 101 at trial, but if you look at some of the evidence at trial, the evidence I think I would point you to primarily is that our expert, Dr. Mattacetti, talked about A, that this is a technical solution to a technical problem in a specific application, but also that he explained that this overcame critical problems with proposed alternatives, and he compared it to, for example, the golden series, another mathematical means of number shifting, or a cyclically shifted equation. And so there are emails back and forth between different scientists, including the inventor of this patent, proposing or discussing the efficacy of the use of this equation because the patent itself discusses the testing that's performed about how often do these signals collide if you use this equation versus others. And so I think that tells you that this is not trying to preempt the use of this equation in mathematics or in any other field. This is linked to achieving the efficiency benefit in the telecommunications equipment, which has the concern about using too much battery to decode too many signals when looking for the control information. And so, in other words, this is not a patent that's directed to the use of the equation. This is a patent that reflects the discovery that this equation achieves an efficiency benefit in this context. That, I think, is enough to make the district court correct at Step 1. And the court did not reach Step 2, though, right? It did not reach Step 2, that's right. Do you agree with the other side that that's an issue that we can decide? I don't. I don't think the court would do that because if there is a fact dispute, which we certainly would say that there is, it would need to be resolved by the fact finder. So the only way Mr. Fleming could be right is if our showing was so flimsy that the court was going to order summary judgment granted on the appellate record when this is not the focus of the party's presentation. Okay, next. I think that takes us to the 112-6 issue. I do want to start with the point, although we'll tread over some of the same ground, that this is just one claim under this patent and they don't have great arguments for why Claim 10 isn't a sufficient basis to find this patent infringed. I understand Mr. Fleming's point that this is a legal error and I'm going to kind of repeat the point about the harmlessness standard. But having said that out at the outset, why don't I get into the merits of it? So there's more to it than Mr. Fleming described to you. In particular, our expert explained a number of things about the type of circuit that this would be embodied in. And yes, it could be achieved in software, but a person of skill in the art would see this as referring to particular types of circuits which are set out in the passage in Column 9 that are referred to in our 20HA letter written this week. You've got to do your cross appeal too. I appreciate that very much. But if we were to agree, assuming we were to send this back for a new trial, what is left? What's not decided? I guess the question is a new trial on what? Let's say on infringement. On infringement of one of these claims? Well, if you were accepting the argument about the verdict form, then I take it that the other side would say, well, invalidity is resolved and you have to retry everything. Infringement of all five and damages for all five. If you accepted that there needs to be a new trial on one of these issues, let's just pick the 557 for sake of argument. Sorry, if you concluded that that patent was invalid and that there needs to be a new trial as a result, I think that our position is it should only be a trial on damages because the other four patents are not infected by that error. And there's been no finding of error in the infringement question as to those patents. And so you wouldn't re-litigate the infringement of those. You would have a new trial on damages. That is assuming that you don't accept our cross-appeal. If you accepted our cross-appeal, then we're back to the number that the jury found that is the exact sum of A plus B plus C plus D plus E. And I think that you could also solve it with remitter in that circumstance. Have I answered your question?  If you want to move on before you get to the cross-appeal just quickly because you want to respond to the damages question and the 403 question. Right. So the damages question on Qualcomm, I think that the key point is that there are two agreements that Mr. Fleming, I think, is trying to – or two documents. Mr. Fleming is trying to kind of lump them together. And I think we've explained pretty thoroughly at the page, Judge Prost, of our red brief that you cited the reasons why the license agreement is relevant to respond to a number of points that Apple made. And I didn't hear Mr. Fleming disagree with that point. So in other words, Apple's argument was, for example, because of royalty stacking, nobody would possibly pay more than $5 for a standard essential package. But you agree they weren't comparable, right? There's no comparability here. And isn't that a requirement? I don't think it's a requirement for there to be any relevance whatsoever to the licensing practices of the defendant. So if we had said, this is the royalty rate, and you should adopt that royalty rate as your – this is the basis of my damages number, that would be a different case. I think that would require a different assessment of the expert's methodology. But in this case, first of all, I think that the responsive points, to say Apple says it would never license anything more than the baseband chip. It would never license a royalty based on the entire handset. Here is evidence of their licensing practice that shows that actually they do. I think that for that purpose, that's entirely proper. But it matters then even in the equation. I mean, this is a weighing thing, right? Relevance and then whether it's prejudicial. So if it's not comparable, that's going to affect the scales, right? Yes, I agree that it would raise the question for this report of what cautionary instructions to give, how great a scope of cross-examination to allow, and how to assess potential prejudice at the end of the case. Sure, I agree that it's relevant to that assessment. But the other side seems to be arguing for a flat, if not comparable in the way that this court's dauber comparability cases contemplate, then it can't come in at all. I don't think that that would be a good rule. It is not a rule that Apple itself followed. In other words, Apple brought in all kinds of evidence in this case that was useful for checking the figures that their expert had accomplished. That's what we did as well. This is not the basis of Mr. Kennedy's damages methodology. He built his damages number based on the second-best alternatives to each of these patented technologies and how much speed gain is attributable to each of them compared to the second-best. So in other words, he built his number in exactly the right way without trying to do it by licensing comparators. And in a case where one party or the other doesn't have a robust history of licensing behavior, I think it would be important to be able to prove damages using the data points that are available, with the district court exercising discretion to make sure that the jury understands what purpose the agreements are being brought in for. And was that done here? No. Was that done here? Well, there was a 403 motion among other... Did Judge Gilstrap tell the jury the limited extent to which they could consider this? I don't think there was a specific instruction about Qualcomm. I'm not sure that there was one requested either once the agreement came in. Of course, the motion limiting was denied before trial. I think I'm understanding the flavor of your 403 argument in response to Judge Crote's question, but I do want to make sure I understand fully why it's not an abuse of discretion here when whatever probative value, which you'll acknowledge, was somewhat limited of the Qualcomm license against the arguably very undue unfair prejudice of the large numbers involved. Did you address that argument either in the district court or on appeal? And even if you didn't, I do want to make sure I hear your argument on that. Sure. So the places where this came up were before trial. We obviously opposed the 403 motion, and then we obviously opposed their new trial motion. And I think in the new trial motion, we said the same thing that we're saying to you on appeal, which is that because this was not the cornerstone or even the backbone, I realize I'm mixing construction and biological metaphors, of the damages methodology, and that's confirmed not just because that's how the expert explained it and not just because of the use to which the expert said he was putting it, but also from the numbers themselves. In other words, the expert did not try to say, here's the number from Qualcomm for five patents and you should award that number to us. No, but aren't there some numbers that are just so big that if the jury hears Apple paid this number, that can't help but unfairly prejudice the jury to think, well, Apple kind of can do this. And don't we have a lot of cases that kind of point to that? Yeah, I think that those cases, Judge Prost, kind of make my point for me, because those are cases in which the expert sort of puts the finger in the wind and says, here's a number, I think in this case, you should award 25% of that number, for example. And this is not that, because of the quite robust record about how this expert built this damages number. I certainly understand the concern about hearing a large number, having an effect on the jury. I think that is for the district court, primarily to police in the first instance. And I don't know of a 403 case that reverses the district court's discretion on that point. I think the cases that Judge Prost is referring to are things that go to the inadequacy of this methodology used by the expert to justify relying on some big number. Because of that, Mr. Flynn, I was wondering your view. Hypothetically, if we were to order a new trial on infringement and damages, it seems to me, in part, there's a chance maybe trial strategy next time doesn't even involve the Qualcomm license. I don't know, but the point being, who knows what evidence you're going to offer for damages at the next trial with all the issues here, the uncertainty maybe with UK. Do you have a view on whether we should be deciding what evidence should have been admitted at the earlier trial if there's going to be a new trial? And this takes me to the cross-appeal. This is on the assumption you don't win the cross-appeal. Yes, right. That's the point. That's the flag I wanted to plant. But on that assumption, obviously, we don't think you should order a new trial. Now, if you were ordering a new trial on both infringement and damages, I don't think it's necessary to address this sort of particular weighing type or abuse of discretion type of thing. But don't you think that hypothetically, we're in hypothetical land that we're in and we decide not to address it and we ultimately would disagree with what happened? Wouldn't it be just unbelievable if we got a new record here three years from now and we look at this and we say, no, it was prejudicial, it shouldn't have come in, that we'd do this again? I thought that's what you were going to ask, Judge Grossman, and here's what I would say. In that circumstance, I think that rather than say, on a Dawbert-like ground, because I took the questions to be about more like the risk of unfair prejudice, that you're certainly open to the court to remind the district court to exercise not just its gatekeeping authority under 403, but its authority to instruct the jury. And if this court were going to review it again, it would review not just sort of the admission of the evidence in a vacuum, but in conjunction with whatever instructions the court gave the jury. Across the field. You've been very patient and I'll be pretty nasty with it. The district court said correctly that Apple had stood silent during the pretrial and was perfectly content to let this case be tried without... Can you ask, and I'm not going to prejudice you from the side, but I have a question just about the record. At some point, Judge Gilstraff says, I'm going to have a bench trial on Fran. Right. So if the parties were satisfied with that, then where is there a waiver? I mean, I don't understand what went down. At what point did he say we're going to have a bench trial? And at that point, were the parties satisfied? So there was no further point to fight about this. So Mr. Fleming is going to stand up here and say, we weren't really satisfied with the bench trial because we have a proffer. We made a proffer. But the point about the bench trial is it never happened. No, it didn't. The court concluded that it lacked jurisdiction because it found the Fran dispute to not be justiciable. Right. Yeah, but that wasn't a fulsome... Sure. I'm sorry. I misunderstood your question. It didn't resolve the Fran issue in that proceeding. And for that reason, the court was... There's really only one paragraph of reasoning in the passage in which the court grants the new trial motion. And that passage basically says, it's my job to see that justice is done and although... But the couple of pages leading up to that is a long discussion of how Apple stood silent because it was very happy to keep this evidence out of the trial. Well, he wasn't particularly happy with what you guys did either. Sure. Let me ask, is your main argument about not meeting the Fran trial this thing about how apportionment, which was included in the first trial, is equivalent to what would be necessary in the Fran context? Is that your main argument? Our main argument, it's a two-part argument that's basically two sides of the same coin. The court didn't address prejudice at all. And the reason that there wasn't prejudice is the instructions that were given about apportionment. So I recognize that the apportionment instructions are not the same thing as an instruction that says, you must consider the contractual obligation to be fair, reasonable, and non-discriminatory. But if you look at the instruction that was given in the second trial, that's basically all it said. It didn't explain what Fran was. It was a pretty net discussion of Fran. There was a royalty stacking instruction, but all the royalty stacking evidence came in in the first trial. So in other words, it's not as if the judge said, I don't want to hear anything about royalty stacking. He just didn't want the word Fran litigated in front of the jury. And so before deciding that the jury award was deficient, I think the court should have looked at the evidence, looked at the jury instructions, and assessed whether there was prejudice. And the court did not do that. And because the questions that the court said, that this court in Erickson said must be asked, were asked about apportionment. So what you're advocating in the cross appeal is that we send it back, we would send it back to the district court judge to do a further, not more fulsome analysis? Well, we think that you can tell that there is no prejudice from the instructions and comparing the evidence from the first trial and the second trial and so on. We think that on this record, there's enough evidence that there wasn't any prejudice from just the omission of the word Fran or the inclusion of the jury instruction on Georgia Pacific Factor V. I think those are kind of the two frandy things that have been identified as deficient in the first trial. But if the court thought, okay, the judge really shouldn't have done this without assessing prejudice and we don't want to assess prejudice ourselves, then I guess that would be our fallback, that you would need an assessment, you need an assessment of prejudice. But the main thing you're asking for in a cross appeal is reinstate the full verdict from the first trial. Right, and Mr. Fleming says, now wait a minute, what about the other Rule 59 motions that we had against that verdict on damages? And that's fine, the district court would have to decide those at that point. I'm not suggesting that those are forfeited, but we are suggesting that you should reverse the grant of the new trial motion. Okay. If I can read the clock right, we're keeping it even, we'll give you three minutes of rebuttal and we'll give you one minute if you need it on the cross appeal. I appreciate it, thank you. Thank you, Your Honor. I appreciate the court's patience today. The only thing I'd add on the UK is one consideration that we've been very alive to is the risk that Optus is going to seek to double dip on the same U.S. patents once in the U.S. and once in the UK. And to the extent that that becomes a risk with further proceedings, it's something we flagged in our briefing, we of course reserve the right to come back, whether to this court or to the district court for appropriate relief. But we're not asking for anything like that now, because as Mr. Jay said, there's more to be done in the UK. With respect to the verdict form, the argument in large measure seems to be that in order to make a narrower argument, we are required to make the broader argument. Obviously there may come a day when this court has to address the possibility of claim by claim, but that's not this case. We're not pressing for it. We don't have to argue for the full reach of a principle in order to argue that what's done here was impermissible at its core. With respect to 101, I think there's a full response to Mr. Jay's argument in this court's decision in In Re, Board of Trustees of Stanford. That is the case where Stanford tried to get a patent on a particular mathematical calculation that was going to be used to improve the prediction of DNA haplotype phases. It was a particular application in a particular industry. It supposedly made things a lot better, and this court said,  merely an enhancement to the abstract mathematical calculation of the haplotype phase itself, close quote, is not enough for eligibility. Just so here, enhancing how you get the random numbers, random numbers that are already being used in the industry to determine where the phone is going to start its searching is not a patentable advance. Maybe there were debates among scientists as to which equation was best, but ultimately, the only actual focus of the claimed advance is the equation, and it's abstract. With respect to means plus function, I'd just point out, Judge Prost, in response to your question, Mr. Jay referred back to column nine. I urge the court in repose to look at that text. Column nine, it's on page 338 of the appendix. It starts at line 26. It's the material that I've summarized that ends with the fact that application of biotechnology is also possible. There is no structure there at all. It is the opposite of structure. With respect to the Qualcomm agreements, the great big number came from, the biggest number that was presented to the jury, came from the settlement agreement. It wasn't relevant at all. Whatever Mr. Jay was saying about the relevance of how the license was structured, that perhaps could have been used. We'd have a different argument if that was all that it was, but it came in for the big number. It was mentioned in the opening statement. It was plastered on the slides. It was in bright red colors. It skewed the damages horizon for the jury. That was the intent. With respect to the cross appeal, I think it's fully addressed in our yellow brief. One quick question. Yes, of course. Give us an example of specific evidence that was excluded from the first damages trial that prejudiced you. Absolutely. We were not able to say that a competitor could not discriminate against Apple in coming up with a license, a royalty rate. This was important because one of the... It's not just that you couldn't say the word friend and non-discrimination. You couldn't prove that whole concept. No, absolutely. This was very important because their damages expert, Mr. Kennedy, said that Samsung, which owned one of these patents previously, was a competitor of Apple's. When they were sitting across the table from each other in a hypothetical negotiation, that competitor relationship would impact negotiations. That's 1870 and 71 of the transcript. He could not have said that if the jury had been instructed that it's a non-discrimination. In fact, when we cross-examined him in the second trial, we specifically brought this up and he agreed. This is 3565 in the second trial. They have to be friends. They can't treat Apple worse because it's a competitor. Correct answer. That's right. Of course, all the non-discrimination points. Thank you. Thank you very much, Your Honor. Do you want your minute for rebuttal from across the field? I won't even take a minute. Footnote four of our cross-the-field reply deals with the evidence that Mr. Fleming was just talking about and the basic point about the Georgia-Pacific factor not being structured to capture this non-discrimination principle. The district court had said he would exclude any Georgia-Pacific factor that the parties asked him to exclude. At the informal charge conference, Apple didn't ask him to strike factor five. When they brought it back up again, he said, I've struck everything that you asked me to strike. You didn't ask me to strike that one. I guess the last thing I'll say is just in response to the point about double recovery, from the U.S. to the U.K., in response to what Mr. Fleming just said. Thank you very much. We thank both sides. It's been very helpful and we appreciate your contribution. Thank you. That concludes our proceedings.